May it please the Court, my name is Paul Allen Levy, appearing for the appellant, and I'm going to try to reserve two minutes for rebuttal. Okay. Counsel, you may have to speak up just a little bit. Sorry. The courtroom's a little cavernous here. I rarely have that problem, Your Honor. For nearly two years, Paul Burgess, a salesman specializing in Anlin brand windows, maintained a website at anlinwindows.com that explained the benefits of that product. Although Anlin was originally enthusiastic about the website, it eventually objected. It withdrew its consent to the use of the mark in the domain name. And the question before the Court this morning is whether the district court was correct that withdrawal of that consent and the demand for surrender of the domain name transformed Burgess's motives for using the domain name into a bad faith intent to profit. And whether that motive is so clearly established on the record as to warrant summary judgment granting Anlin's ACPA claim and thus the award of the heightened remedies that that statute affords. My argument this morning will be that it did not. Congress set forth nine factors to be considered in deciding whether there is a bad faith intent to profit, and those factors point strongly, indeed, I would say exclusively, in Burgess's favor. We contend that the factors so strongly favor Burgess that the right result today would be a remand with instructions to enter summary judgment for Burgess. But at the very least, enough factors favor Burgess that there was a genuine issue about the fact of Burgess's alleged bad faith intent to profit warranting remand for trial on that issue. Kennedy, did you ask for a jury trial in the first instance? I do not. I do not remember whether there was a jury demand, but I don't think the summary judgment standard varies depending on the case. I understand, but I just wondered, if it goes back, is it a jury trial? I can submit something after about what the record says. I do not recall. I was not counselable. There was no counsel below on Mr. Burgess's side. The Court, of course, need not always discuss those factors one by one, as Judge Beck did not. But when departing from the factors, it's our position that a court should focus on Congress's purpose in enacting the statute, on the prototypical case at which the ACPA was aimed, the extortion of registration and use of domain names for the purpose of by people who have no legitimate use for the domain name. At bottom, Anlin doesn't even argue that that's what was going on here. It argues this is an infringement case. It says we withdraw our consent, therefore he was an infringer. But even if there was an infringement and we don't concede that, the fact of the matter is that's an infringement claim. It's not sufficient to create bad faith intent to profit under the ACPA. Now, before discussing this specifically. Alito, your argument is the way that you framed the issue was that withdrawal of consent can't transform intent into bad faith. Yes, that's because that's the way the judge saw the case. But if Mr. Burgess has sort of done what he needs to do. I mean, he's an aggressive salesman. He's obviously taken advantage of the Internet in a way that other salesmen in California didn't see fit. He's apprised himself of how the algorithms work. He's trying to bump himself up on the Google and Yahoo scale and seems to have done so very successfully. At some point Anne Lynn says, you know something, we're getting complaints from other people because it's clear that this guy is sort of suppressing everybody else's sales because he's worked his way to the top of the algorithm. Now, if he, if at that point the company comes in and says, look, we don't want you to, we withdraw our consent for you to use our name in your Web address. You can use anything else you want. We're happy to have you put Anne Lynn Products feature prominently, just not in your Web address. In our view, we do not argue Anne Lynn's consent as a basis for the absence of bad faith intent to profit. That may well be relevant to an infringement claim, but the bad faith intent to profit does not turn on that because the ACPA talks about diverting consumers from the mark owner's online location, not from people affiliated with them. Well, that's one of the factors, but that's not, as I look at those nine factors that are there, that's not. That's not all that I see. And let's talk about the factors. And in talking about the factors, I think there are two preparatory points to make. First of all, there are four what I call negating factors, factors which, if they're present, tend to suggest that there was no bad faith intent to profit. And then there are four suggesting factors, factors five through eight. If any of those are present, they tend to suggest that there is a bad faith intent to profit. And the factors are to some extent mutually exclusive, so you can't just count them up and say, well, there are five in one direction and four in the other, because the presence of some necessarily indicates that others can't be present. And finally, there's the ninth factor, which can point in either direction. And second, in construing the factors, it's important to recognize that they're there for a reason, that they reflect the behavior of the classic cyber squatters at which this statute was aimed. And they also reflect, the wording of each of the factors reflects Congress's recognition that there are often legitimate reasons for the use of a trademark in a domain name by someone other than the trademark holder. So beginning then with the specific factors, Burgess benefits from two of the negating factors. The first is factor three, which reads, and I quote, "...prior use, if any, of the domain name in connection with bona fide offering of goods and services." Well, that's exactly what Burgess did. He used the domain name in good faith to sell the trademarked product and, of course, to sell his own services installing that product. Prior use, in our view, means use before the challenge to the use took place. Now, Anlin argues for a different construction of the words prior use. It says it means that the defendant must have used the trademark before the plaintiff used the trademark, much as if you had two companies contending over priority for use of the trademark. But with respect to opposing counsel, that argument makes no sense. If the defendant used the mark first, it would be the defendant that owned the mark, and you'd never get to the bad faith intent to profit factors. Burgess also benefits from negating factor four, bona fide noncommercial or fair use of the mark in a site accessible under the domain name. Unlike factor three, which focuses on the use of the domain name, factor four addresses only the use of the same mark in the website that's accessible under the name. That's the language of the factor. Anlin concedes that it doesn't object to Burgess's use of its marks on the body of his website. It argues instead that the use of the trademark in a domain name can never be fair use. That is irrelevant, however, because under the language of the statute which matters is use of the mark in the site that's accessible under the name. And indeed, we think Anlin is wrong about its construction of factor four for a reason similar to the reason why I lost in Bosley. The Court rejected our argument in Bosley that the ACPA never applies to the noncommercial use, and the reason was it conflicts with the fact that noncommercial use is considered in factor four. So if noncommercial use never constitutes a violation of the ACPA, the reference to noncommercial use in factor four would be a nullity. By the same token, you only get to the bad faith intent-to-profit factors if the domain name is identical to or confusingly similar to the mark. So if Anlin is right that a domain name, if a domain name matches the trademark, factor four never applies, then the words fair use in factor four become a nullity. And so the argument is really structurally the same one as the one that the Court accepted from the plaintiff's side in Bosley. Turning now to the suggesting factors, none of them apply. First of all, we have factor five, which is quite long. I'll read it. The person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site. Two reasons why, independent reasons, why Burgess wins under factor five. First of all, he had no intent to divert consumers from Anlin's online location. Anlin's concern is with a diversion of business from other dealers, but they aren't the mark owner, and for factor five, they don't matter. Indeed, in the excerpt of record at page 17, the district court expressly found that Burgess did not have intent to divert consumers from Anlin. Now, Anlin argues in its brief, and correctly, that the court was talking about the time when consent was withdrawn in that part of his opinion on page 17 of the excerpt, but what it doesn't explain is how withdrawal of Anlin's consent affected Burgess's intent to divert from Anlin's online location. Burgess also prevails under factor five because there is no evidence of likelihood of confusion as to the source of the site. Anlin does not argue the sleek crap factors about the site. Anlin does complain that at one point the site had a misleading banner, welcome to Anlinwindows.com, but that banner was gone at the time when bad fake intent to profit was found. And the deed is still there. And what time was the banner removed? The banner was removed when the complaint came in. What time? I believe it was in February 2005. And when was consent withdrawn? It was in response to the withdrawal of consent. The site made clear that it was affiliated with a dealer at the time bad faith intent to profit was found, and indeed it gave a hyperlink to Anlin's own website. Finally, Anlin did not move for summary judgment on likelihood of confusion as to the site, and so summary judgment can't be affirmed on a ground on which it is not. Dr. Six. You're asking for trial in essence, right? I'm sorry? You're asking for trial? I would prefer – I believe the factors are so clear that we're entitled to – we're just moved for summary judgment on the ACPA, and we think that motion should have been granted. We ask for a remand with instructions to grant summary judgment. However, if we can't get that, then we prefer a trial. We prefer a trial to losing altogether, that's for sure. Would the trial go to the nine factors, or would it just go to the safe harbor provision? No, I think the trial goes to the ACPA claim. I'm not going to argue the safe harbor here. I think it's adequately covered in the brief, so I'll answer any questions the Court might have about it. But I think the trial goes to all the elements of the ACPA claim and all the defenses to an ACPA claim. If it goes back for trial – if it were to go back for trial, does the trial court pick up the two dismissed causes of action? I guess – Were conceded or they were dismissed by agreement? I think it would probably be opened – since they were dismissed without prejudice, it's probably open to Anlin to refile them. They're not in the case currently. Is it too late to do that, or – I doubt it. Today, I doubt it. Whether that would be true in a year after further proceedings in this Court and the Supreme Court, it's hard to be sure. I think today it would certainly be – it would certainly be timely. It wouldn't be outside the statute of limitations. Right. Okay. Factor 6, offer to transfer sale, otherwise the same, the domain name for financial gain without having used or having an intent to use the domain name in the bona fide offering of any goods and services. Anlin here relies on the fact that after the threat of litigation, it was able to draw him into negotiation about the terms on which he might surrender the domain name. But that's irrelevant because – It wasn't just one domain name. There were three others that he wasn't using. But, yes, it's – he has an affidavit saying he intended to use them for the same purpose. In fact, he registered them immediately after Anlin said it was happy with the first domain name. We think that additional registration in those circumstances doesn't suggest bad faith intent to profit. But for the purpose of this factor, he had the intent to use the other domain names. That's one. And he certainly used the original domain name in the bona fide offering of goods and services. And so the fact that there were negotiations over the price for a domain name doesn't mean that Factor 6 favors Anlin instead of favors Bush. Can we go back to those three other domain names to foreclose any other dealer in the product doing similar conduct? Actually, there are numerous – you know, you can register a .info name, a .us name. You can register Anlin window. There are plenty of ways to register other domain names, not to speak of using other methods to bring your website to consumers' attention. I thought that Judge Beezer's question was, does that indicate, then, that you are precluding other people from acquiring any kind of an Anlin name that they can use in their web address? No, because of the many ways in which you can play with the trademark and combine it with various top-level names. But he had picked up four very, very good names, hadn't he? That may well be true. But Anlin picked the name it wanted. And the question under the ACPA is precluding the mark owner, not precluding the dealers. And so that may well be an argument on an infringement claim, but it's not an argument under the ACPA. In fact there is an – there was an infringement article in the complaint, wasn't there? There certainly was. And that's dismissed. And that was what I was asking about. Does that come back to life again? Well, they voluntarily dismissed it. So I think it would be up to them to move to amend their complaint to add it. There's been an answer, so they can't amend it as a matter of right, but I'm not conceding. It's proper. Is that your position? I think today it would not be barred by the statute of limitations. That's certainly correct. All right. I see my time is about to expire. I had other things to say, but I'll get to it. Okay. Good morning, Your Honors. My name is John Michael, and I represent Anlin Industries, Inc., the appellee in this matter. Although this is an appeal from a motion for summary judgment, the bigger issue that we're concerned with here today is the right of a manufacturer to control the use of its trademarks in the initial chain of distribution prior to the first  Anlin is such a manufacturer. It manufactures vinyl replacement windows. It has several registered trademarks. Counsel, the words that you used as you framed the issue dealt with controlling trademarks and first sale. Those are all loaded words, but they're not out of the Cyber Squatting Act. No, they are dealing with the Lanham Act, but you've conceded. You've dismissed those counts, right? They're really not an issue here. We have dismissed them without prejudice. Those sort of loaded words aren't part of the act that's before the court today, are they? I understand that, but one of the ways that we're getting to a bad faith intent to profit is through the willful infringement that Mr. Burgess committed after his consent to use the trademarks was withdrawn. We're asking the court to use the continued use after his license was terminated, recognizing that that's a willful infringement, and this court has termed infringement as a fraud on the public, fraudulent, in bad faith. We're asking the court to take a look at that evidence and use that evidence in order to make a determination that Mr. Burgess had a bad faith intent to profit when he used the mark in his domain name after his consent was withdrawn. So are you arguing, counsel, that violation of the trademark laws could be evidence of a violation of the Cyber Squatting Act? Yes, that's exactly the argument. Why didn't you just bring it directly into the trademark laws? Well, we did that also, but there are- It seems like kind of a roundabout way to get at an act that was really designed to get at people who were sucking up domain names and then selling them for, through extortion, basically. Well, that wasn't the only purpose of the act. There are statements that are contained in the Senate report on the act that talk about that the abusive conduct that is made actionable is bad faith use of another's mark by people who seek to unfairly profit from the goodwill associated with the mark. And it's our position that that's exactly what Mr. Burgess was doing here. It's not only for the typical cyber squatter profile of somebody that warehouses a bunch of domain names. There are a myriad ways of abusing somebody's trademark and trading- The funny thing about this case is that Mr. Burgess is sort of inside the family. That's one of the things that makes it a novel issue, is that we're not dealing with a competitor who's using a trademark to, say, in comparative advertising to talk about the physical characteristics or the quality of Anlin's product. It's all to the management's business of the owner. He sells more product. That's true, but it may or may not be true that it sells more product. But what it does is it's inconsistent with Anlin's business plan, which was they sell through a network of about 40 dealers. Why did they give the consent in the first place? Excuse me? Why did they give the consent in the first place? They thought they were hurting their- For purposes of this appeal, we are conceding that there was consent. And I suppose one of the reasons would be that Anlin at that time was not sophisticated about the use of the Internet and didn't see all the implications. But what year was the consent given? I believe that Mr. Burgess alleges that that conversation occurred in approximately 2003. There's no finding of fact on that anyway. I mean, there's nothing in the affidavits one way or the other from both sides? The affidavits from Mr. Burgess talk about the conversation occurring in response to that affidavit, because this was a motion for summary judgment. We chose not to controvert that fact. Well, you had his conversation was with Mr. Vidmar, and he does seem to have telephone records showing that he had a conversation with Mr. Vidmar's, with somebody at Mr. Vidmar's telephone number during that period. Sure. He did have a conversation with somebody at the telephone number during that period. But it shows, I believe it shows that it was an outgoing phone call from Mr. Burgess as opposed to an incoming phone call from Anlin Industries. And that's exactly opposite of what Mr. Burgess said occurred. But in any event, because for purposes of this motion, we're conceding that that conversation occurred, I don't think whether it was an ingoing or an outgoing phone call really is a relevant issue. The Senate report Why don't you tell us about the factors? I wasn't going to talk about the factors, because I fully briefed those factors. All right. Well, if you have something that you think is more persuasive to the Court, let's hear it. I think the fact that Mr. Burgess was a link in the chain of initial distribution of Anlin's products where, before the first sale of the product, where Anlin had an uncontroverted right to control the use of the trademark is a very important point in this case. We're not dealing with a competitor issue where there's comparative advertising. We're not dealing with a situation where there's non-commercial speech. We're not dealing with a situation where there's a bona fide purchaser who turns around and resells the product, which is protected by the first sale doctrine. What we have here is where one of the links in Anlin's own distribution chain is using a trademark in a way that's inconsistent with its business plan. At the — I understand that's a novel issue and it doesn't fit into — Isn't the — isn't the distribution chain an independent contractor? It just buys from the manufacturer and sells at retail, or sells to retailers? Some are, some aren't. But the point is that at the point that Mr. Burgess was trying to make these sales, there had been no sale at that point. He was acting on behalf of the dealer who was acting on behalf of Anlin in order to arrange the sales. Okay. The most analogous situation that we've been able to uncover to this situation is where there's a franchise relationship. And in that situation where you have a franchisee, they obtain a license to use the trademarks from the franchisor. Where the franchisor terminates the consent of the franchisee to use a license, the continued use by the franchisee of the trademarks constitutes an infringement. And because the franchisee knows that the consent has been used to use a license, it constitutes an infringement of what? Excuse me? It constitutes an infringement of what? An infringement of the contract? Of the trademark. Of the trademark. Sure. Could Anlin Industries have simply terminated Mr. Burgess as a distributor? Mr. Burgess was not, in fact, the distributor. It was a better quality home. And he was just working for better quality homes. And Anlin could have just terminated better quality homes. And that would have put us into the situation, your franchise analogy, that if they continued to use the Anlin name, then they would have been in violation of the trademark. That would be one way to put us into the analogy. But the other way is that... But that also would have put you into the trademark laws and not into the Cyber Squatting Act. But, again, I think that the court can use evidence of a willful infringement, by analogy to the franchise laws, in determining whether or not there was a bad faith intent to profit under the ACPA. I don't think that a manufacturer's rights should be limited to one or the other. I think that if there's a case where there's infringement and there's a bad faith intent to profit as a result of that infringement, that the manufacturer has the right to choose the remedy that it wants to seek. What we're asking the court to consider in this case is whether we're a license... Were better quality homes using any... Were they offering other windows besides Anlin windows? They seem to be featuring Anlin windows pretty prominently. No. They were an exclusive dealer for Anlin windows. Okay. So they weren't... They didn't have Anderson windows or some other replacement window? No. That was one of the requirements. So they weren't using Anlin windows then to attract people to the website and then try and sell them something else? No. They were trying to sell them Anlin windows, but trying to sell them in a way that interfered with Anlin's relationships with its other dealers. Anlin received complaints from four of its dealers about Mr. Burgess's website, saying that they were concerned that he was diverting customers from them to him. What would happen is the customers would come in. These people spent thousands, tens of thousands of dollars in advertising to bring the people into their businesses. People would come into their businesses, the businesses would educate the consumers about Anlin windows, tell them to go check out the website. The consumers would type in anlinwindows.com, go to Mr. Burgess's website, and purchase the windows from him rather than from the dealers. The dealers have their own websites? Some of them did at that point. Some of them didn't. I'll bet they do now. But they're still going to be below better quality homes on the algorithm? Maybe, maybe not. I think it depends on what you pay the search sites for, what your ranking is, how that comes up. But these dealers comprised about 15 percent of Anlin's sales, about $10 million out of the $65 million in sales that Anlin makes each year. And that's a very competitive business. That Anlin competes not only for the ultimate retail customers, but it also competes for dealers. And if a dealer is dissatisfied with Anlin for whatever reason, it can switch to another manufacturer, and that leaves Anlin without an entry into a particular market, either a geographic segment or an economic segment of the market. And if these four dealers were dissatisfied enough to leave, that would have affected 15 percent of Anlin's sales at that point. So what we're asking the court to consider is whether where a licensee continues to use a trademark in his domain name to generate business after his license has been terminated, that that constitutes a bad faith intent to profit under the ACPA. We're asking that the court look at the undisputed evidence that Mr. Burgess continued to use the trademark Anlin Windows in his domain name after Anlin's consent was withdrawn. Then we're asking that you analyze that evidence in light of the cases that we cited that indicate that where a licensee's continued use of a trademark, where he continues to use a trademark after consent is withdrawn, that that has been withdrawn, that's a willful infringement, which has been terminated. Do you have any cases in which anybody has used this argument, that is, that evidence of willful infringement of the trademark laws constitutes bad faith for purposes of a cyber-spawning act? I don't have any cases that specifically state that. But there are no cases that say that the court cannot use that evidence in order to determine whether there's a bad faith intent to profit. And considering the similarity between the laws, considering the purposes between the laws. Is there a difference in the remedies between the trademark laws and the cyber-spawning? We've heard so much about trademark laws. I'm still trying to figure out why you're bringing a cyber-spawning claim here, instead of just taking it straight up under the trademark laws. What are you getting under the cyber-spawning act that you're not going to get under the trademark laws? A transfer of the domain name to us. The unused domain? The unused domains and the anilinwindows.com. Yeah. That's the remedy. And $1,000 has to go with it, right? Excuse me? I'm sorry. That's the penalty? I didn't hear the question. I'm sorry. And $1,000 goes with each one of them if the court orders them transferred, right? Because that's a violation of statute. I believe so, although the court in this case ordered statutory damages of $2,500. Had you bought a trademark and prevailed on a trademark name, then they would simply be prohibited from using those websites, although they would still remain the owners of them? In a trademark case? Right. Yes. They would be prohibited from bringing the? They would be prohibited from using the trademark, the sites for any trademark purpose, but would still remain the owners. At that point, they could set up a bribe site. They could use it for comparative advertising. They could use it for something that's permitted under the trademark laws. So, in summary, what we believe the facts show is that there's undisputed evidence that shows that Mr. Burgess continued to use the trademark in the domain name after his consent was withdrawn. That constitutes a willful infringement. Willful is equated with fraudulent and bad faith under the court's decision in the Lindy case that's cited in our brief. And that, therefore, Mr. Burgess's continued use of the domain name after his consent was withdrawn indicates that he had bad faith in using the domain name, and because he was using the domain name to attract customers and make sales, he was using it to turn a profit. Therefore, he had a bad faith intent to profit, which is actionable under the ACPA. Let me ask you one more question. Did this come up on cross motions for summary judgment, or just? It did. We filed our motion first, and then Mr. Burgess replied to the cross motion. All right. Did the district court make findings of fact on contested issues? The district court made some findings of fact. On contested issues. No, I don't believe so. I think the court just decided undisputed. Do you think all the facts of both motions were consistent, or were there some that were inconsistent? I think the motions, for the most part, both relied on consistent evidence. And they were factually consistent? There was a dispute in the evidence. It was with regard to Mr. Burgess's motion for summary judgment. Is that a sufficient reason to send it back for trial? Excuse me? Is that a sufficient reason to send it back for trial? No, because those issues were on those disputes were on issues other than affected the ACPA. Those were on the infringement issues, which is why the judge declined to issue summary judgment on those issues. Thank you, counsel. Thank you. Mr. Levy, you have very little time remaining, but I will afford you just enough time to respond very, very briefly to anything that needs clarification. I have two basic points to make, maybe two and a half. It's apparent that Antlin is not prepared to argue the factors. It asks you to apply to take the gestalt approach, so to speak, without regard to the factors. And yet it admits that this is a novel issue, the salesman who's inside the family. The statute was not aimed at this situation. And we submit that when you have a new statute that's aimed at a relatively narrow situation. And when the plaintiff has another remedy, the Lanham Act, that will afford it full relief as to the domain names, and it is certainly not correct that they can't get an injunction for transfer of the domain names under the Lanham Act. After all, before the ACPA was enacted, that's how plaintiffs got domain names taken. I imagine, I was just looking in the court of appeals decision in Panavision v. Teppan, but that was a case decided before the ACPA about whether the Panavision domain name infringed or diluted a trademark, and I dare say that what they got out of that case was an injunction for the domain name. Don't contort the statute to deal with a situation it wasn't content to deal with. Either go back to Congress and get a new statute passed or use the broader Lanham Act to get what they want. What the difference is, of course, statutory damages and perhaps more ready access to attorney fees. There is a specific statute for the extortionate situation where heightened remedies are allowed, but where it's simply infringement, or if it's willful infringement, then prove damages and get treble damages. On the question of if the case goes back to trial, we do think that the case need not go back to trial. On the safe harbor thing, the issue of the safe harbor, it would be my view that the existence of a good-faith belief that the use was lawful would be a factual question that could be tried, although I don't think it's disputed. Whether the belief is true. Kennedy Good faith survives the direction to stop. The owner of the mark says don't use it anymore. That's the evidence. And then he goes to you. But there are many situations in which there's a fair use. Somebody is using the product, name of the product, to describe what he's selling. Just like the repairer of automobiles in this Court's Volkswagen case, where the court said, yes, you can use Volkswagen to say this is the name of the product that you repair. Mr. Burgess felt, and I believe reasonably, my point was going to be that the reasonableness of his belief is a question of law. The good faith of the belief is a question of fact. But he believes that he's entitled to use the trademark truthfully to identify the product that he's selling. That's classic nominative fair use. Just as USA Today was free to use the name of a particular band to describe the name of the band they are running a poll about, that's nominative fair use. And I think it was a reasonable belief as well as a good faith belief on the safe harbor matter. Thank you, Counsel. Hanna v. Burgess is submitted. The last case on the oral argument calendar today is United States v. McCall.
judges: Goodwin, Beezer, Bybee